COURT OF APPEALS OF VIRGINIA


Present:  Judges Coleman, Bray and Bumgardner
Argued at Chesapeake, Virginia


ROGER COREY NEWTON

MEMORANDUM OPINION* BY
v.    Record No. 1586-99-1     JUDGE RICHARD S. BRAY
MAY 16, 2000
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Robert W. Curran, Judge

Paul H. Wilson (Wilson & Wilson, P.C., on
brief), for appellant.

Amy L. Marshall, Assistant Attorney General
(Mark L. Earley, Attorney General, on brief),
for appellee.


Roger Corey Newton (defendant) was convicted in a bench trial of rape in violation of Code § 18.2-61.  On appeal, he challenges the sufficiency of the evidence to support the conviction. Finding no error, we affirm the conviction.

The parties are fully conversant with the record, and this memorandum opinion recites only those facts necessary to a disposition of the appeal.

In reviewing the sufficiency of the evidence, we consider the record "'in the light most favorable to the Commonwealth, giving it all reasonable inferences fairly deducible therefrom.  In so

———————————

        * Pursuant to Code § 17.1-413, recodifying Code § 17-116.010, this opinion is not designated for publication.

doing, we must discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth . . . .'" Watkins v. Commonwealth, 26 Va. App. 335, 348, 494 S.E.2d 859, 866 (1998) (citation omitted). However, "the fact finder is not required to accept entirely either the Commonwealth's or the defendant's account of the facts. Similarly, the fact finder is not required to believe all aspects of a defendant's statement or testimony; the judge or jury may reject that which it finds implausible, but accept other parts which it finds to be believable." Pugliese v. Commonwealth, 16 Va. App. 82, 92, 428 S.E.2d 16, 24 (1993) (citation omitted). Thus, the credibility of the witnesses, the weight accorded the testimony, and the inferences drawn from the proven facts are matters to be determined by the fact finder. See Long v. Commonwealth, 8 Va. App. 194, 199, 379 S.E.2d 473, 476 (1989). The judgment of the trial court will not be disturbed unless plainly wrong or unsupported by the evidence. See Code § 8.01-680.

## I.

Viewed accordingly, the instant record discloses that, on the evening of June 26, 1998, the victim, H.H., her boyfriend, Curtis Bancroft, and "a few . . . friends," including defendant, gathered for "a little get together" in a "camper" located in the backyard of Bancroft's parents. H.H., Bancroft, and defendant consumed considerable beer and vodka during the evening and were all

-

"drunk" by midnight. H.H. recalled that, "sometime between 12 and 5 a.m.," she and Bancroft "laid down" on a bed inside the camper that the two had agreed to share with defendant. "[U]ncomfortable," H.H. removed her "pants" and, clothed only in "bikini [bathing suit] bottoms . . . bra and a shirt," initially rested on the side of the bed "against the wall," with Bancroft in the middle and defendant then elsewhere in the camper.

Bancroft "basically passed out," but H.H. "felt kind of sick [and] . . . got up to go to the bathroom." When she returned, she "sat down on the bed" to "smoke[] a cigarette," with defendant seated next to her, also smoking a cigarette, and they "just chitchatted for a little while." Although unable to remember details of the conversation, H.H. "clearly" recalled that she soon "laid down[,] . . . wrapped [her]self in [Bancroft's] arms," "lean[ed] towards" Bancroft, with her "arms around him too," and "passed out," "due to intoxication." Bancroft was then positioned against the wall in the bed, H.H. was in the "center," and defendant was "messing with the radio" in another room.

Uncertain "how long [she] was asleep," H.H. awoke to find defendant "on top of [her]," with his arms "pushed up . . . on each side of . . . [her] head, [and] his lower body . . . laying down." "[S]hocked," she closed her eyes momentarily, reopening them as defendant "was rolling off." She was then on her back, beside Bancroft, with her hands at her head, legs "spread apart and open," shirt raised above her bra, and bikini bottoms "around

-

[her] left ankle." After "a second," H.H. "sat up[,] . . . looked down," noticed "semen . . . all over" her "lower stomach and . . . vaginal area," and observed defendant's "butt . . . and lower back," as he turned and began "pulling his pants up." When she inquired, "what did you do to me?" defendant "act[ed] like he was asleep." H.H. testified that she "sobered up quick because [she] was so scared" and recalled "everything . . . clearly," save the precise time of events.

"[C]rying and scared," she immediately woke Bancroft, advised that defendant had "done something to [her]," and explained "everything" to him. Bancroft, "really drunk" and confused, suggested, "let's get out of here and . . . discuss it in the morning." The two then proceeded to Bancroft's apartment, H.H. showered and "went back to bed" with Bancroft. Upon awakening the following morning, H.H. and Bancroft had sexual intercourse, and she returned to the home of her parents. "Scared and . . . in shock," because defendant "was supposed to have been a friend," H.H. did not immediately notify the police of the incident.

Two days later, on June 29, 1998, H.H. and Bancroft, accompanied by "a few . . . friends," decided to visit defendant "to talk to him and find out why he had done this." On arrival at the apartment defendant shared with his mother, Bancroft became "belligerent," threatening defendant and inviting an altercation. As a result, defendant's mother summoned police, complaining of "harassment" at her home by Bancroft. H.H. and Bancroft explained

-

the circumstances to police officers dispatched to the scene, and defendant was arrested for the subject offense.  En route to police headquarters, defendant admitted "consensual sex" with H.H. and speculated that she "was making up this story . . . so she would not lose her boyfriend."[1]

Testifying at trial, defendant explained that he and H.H. had "started to kiss" while seated on the bed smoking cigarettes and "talk[ing]."  "One thing led to another and . . . [they] ended up -- having sex."  He insisted H.H. "cooperated through the whole thing," was "kissing on him," helped remove her bikini bottoms and placed "her hands around [him]," participating and responding with him in consensual intercourse.  Defendant testified that he "pulled out," "ejaculated," walked to the bathroom and overheard H.H. speaking to Bancroft, previously asleep the "whole time . . . next to [H.H.]."  Defendant acknowledged that H.H. then "wanted to go" and immediately departed with Bancroft.  Although no confrontation occurred between defendant and Bancroft at the camper, Bancroft "asked [defendant] what had happened" during an encounter "two days later" and defendant "didn't have no response."  The visit to defendant's home soon followed this exchange.

---

[1] Forensic evidence established the DNA profile of sperm from vaginal/cervical swabs was consistent with that of Bancroft, but not defendant.  However, the DNA profile of sperm collected from the "crotch area" of the bikini bottoms was consistent with defendant and not Bancroft.

-

Defendant further testified that "some two and a half years" prior to the incident, he and H.H. "saw each other" and "messed around," "did everything but have penetration." H.H. acknowledged that, "[a]t least . . . two years" before the offense, she and defendant "tried dating," "kissed," but "never had oral sex . . . [or] intercourse." However, she maintained that this relationship quickly ended and, on the night of the incident, she neither desired nor permitted "sexual contact" with defendant, declaring, "I couldn't, I was passed out."

In challenging the sufficiency of the evidence, defendant argues that H.H., unable to "remember what happened[,] . . . cannot disprove her consent to the act" and, further, that her account of the events, together with her subsequent conduct, was contrary to human experience and unworthy of belief.

## II.

Code § 18.2-61(A) provides, in pertinent part, "[i]f any person has sexual intercourse with a complaining witness who is not his or her spouse . . . and such act is accomplished . . . through the use of the complaining witness's . . . physical helplessness . . . he or she shall be guilty of rape." The "physical helplessness" contemplated by the statute "means unconsciousness or any other condition existing at the time of an offense under this article which otherwise rendered the complaining witness physically unable to communicate an unwillingness to act and about which the accused knew or should

-

have known." Code § 18.2-67.10(4). Sleep can constitute the requisite "physical helplessness." See Woodward v. Commonwealth, 12 Va. App. 118, 121, 402 S.E.2d 244, 245-46 (1991).

Here, the evidence established that H.H. "passed out" of consciousness and into a deep sleep, heavily intoxicated after consuming both beer and vodka throughout the evening and, doubtless, fatigued by the late hour. The evidence further proves that defendant, aware of H.H.'s helplessness, removed her clothing and sexually assaulted her, unafraid that the equally stuporous Bancroft would either notice or recall the incident. Contrary to defendant's contention, such circumstances explain the confused and tentative responses of H.H. and Bancroft immediately after the offense, reactions that developed into outrage during the ensuing several days.

Defendant's contention that H.H. was unable to recount the events of the evening is belied by the record. While forgetting details of her conversation with defendant, she "clearly" remembered the activities that preceded the unconsciousness of her sleep. Her inability to recall events that transpired while asleep does not discredit her memory of circumstances observed upon awakening.

We acknowledge the well established principle that a conviction of rape cannot be sustained "if the evidence is inherently incredible, or so contrary to human experience or to

-

usual human behavior as to render it unworthy of belief."

Willis & Bell v. Commonwealth, 218 Va. 560, 563, 238 S.E.2d 811, 813 (1977).  However, a conviction may depend upon the "uncorroborated testimony of a prosecutrix if her evidence is credible, and the guilt of the accused is believed by the [fact finder] beyond a reasonable doubt."  Id. at 563, 238 S.E.2d at 812.  On the instant record, the court finds support in crediting H.H.'s recollection of events, disbelieving defendant and convicting him of the instant offense.  "'The living record contains many guideposts to the truth which are not in the printed record; not having seen them ourselves, we should give great weight to the conclusions of those who have . . . .'"  Ketchum v. Commonwealth, 12 Va. App. 258, 263, 403 S.E.2d 382, 384 (1991) (citation omitted).

Accordingly, we affirm the conviction.

Affirmed.

-